IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


VEHICLE PROTECTION PLUS, L.L.C., )
 )
  Plaintiff, )
 )
v. )  No.  2:06-cv-241
 )
PREMIER DEALER SERVICES, INC., )
and GREAT AMERICAN INSURANCE )
COMPANY, )
 )
  Defendants. )


## <u>MEMORANDUM OPINION</u>


   This civil action is before the court on the following motions: plaintiff's

partial motion for summary judgment [docs. 45 and 46], to which the defendant

has responded [doc. 56], and the plaintiff has filed a reply brief [doc. 63];

defendants' motion for summary judgment [docs. 47 and 48], to which the plaintiff

has responded [doc. 57], and the defendants have filed a reply brief [doc. 59];

and defendants' evidentiary objections to and motion to strike portions of the

plaintiff's affidavits [docs. 60 and 61], to which the plaintiff has responded [doc.

66], and the defendants have filed a reply brief [doc. 69].  The court finds that oral

argument on the motions is not necessary, and the motions are ripe for the

court's consideration.  For the reasons discussed below, the plaintiff's motion for

partial summary judgment will be granted, the defendants' objections to and motion to strike portions of the plaintiff's affidavits will be denied, and the defendants' motion for summary judgment will be denied in part and granted in part.

## I. FACTUAL ALLEGATIONS

Before setting out the relevant facts, it will be useful to name the individuals and the companies with which they are associated. The court notes that neither the plaintiff nor the defendants provided this information. It has been gleaned from the content of the emails provided as exhibits to the motion and response.

Plaintiff Vehicle Protection Plus, L.L.C.

Ben Crumley
Ron Glime

Defendant Premier Dealer Services, Inc.

Kevin Mohan
Dan Schmidt
Bob Shepard
Lisle Greenweller

Defendant Great American Insurance Co.

Ken Schneider
Ted Terry

Warrantech Automotive, Inc.

Joel San Antonio

2

The plaintiff (sometimes referred to as VPP) sells vehicle services (extended warranty) contracts through agents to automobile dealerships nationwide. The plaintiff contracts with other entities to administer the claims filed on the vehicle services contracts, which involves answering customer calls for repairs, adjudicating claims and arranging for authorization of repairs and payments. In May 2000, the plaintiff contracted with Warrantech Automotive, Inc. to be the third party administrator of its vehicle services contracts. This was not an exclusive contract for either party.

Most states require that businesses like the plaintiff maintain insurance coverage on each of the vehicle services contracts it sells. Since the plaintiff is not an insurance company, in September 2000 the plaintiff obtained the necessary policy through defendant Great American Insurance Company. By the terms of the insurance policy, Great American was required to pay all of the plaintiff's obligations for the vehicle services contracts if the plaintiff fails to meet those obligations, provided that the administration of those claims was conducted by a third party administrator acceptable to Great American. Warrantech was an acceptable administrator.

In about 2003, the plaintiff began to hear rumors that Warrantech was having some financial problems and that its agreement with Great American might not be renewed in 2005. If Warrantech was no longer an "acceptable" claims administrator, the plaintiff would have to find another claims administrator

3

that was acceptable to Great American. On behalf of the plaintiff, Ben Crumley and Ron Glime decided that the way to protect the plaintiff's business was to have a direct relationship with Great American. They arranged a meeting with Ted Terry and Ken Schneider of Great American, and they were told at that meeting that the relationship with Warrantech would "most likely" not be renewed. Sometime in the fall of 2004, Schneider arranged for Glime and Crumley to meet with agents of defendant Premier Dealer Services, Inc. ("PDS"), a wholly owned subsidiary of Great American.

In January 2005, the plaintiff entered into an Administrative Agreement ("Agreement") with PDS wherein PDS agreed to act as a third-party claims administrator for "all" the plaintiff's vehicle service contract and limited warranty claims.[1] By its terms, the Agreement became effective December 1, 2004. The Agreement provided that Illinois law would be used to interpret the Agreement. Further, the Agreement contained an integration clause stating that the Agreement "constitutes the full agreement between the parties. No amendment to the Agreement shall be valid unless in writing and signed by the parties . . . . Therefore, this Agreement shall be the only agreement in effect for the kinds of insurance and Programs defined herein."

---

[1] A copy of the Administrative Agreement is attached to the plaintiff's motion for partial summary judgment [doc. 45]. The defendant found it necessary to attach three more copies of the Agreement in the exhibits to its response.

4

At Great American's request the plaintiff delayed sending business to PDS and continued using Warrantech. Great American says that the reason it made the request was because it did not want to create a "predatory" situation between Warrantech and PDS. Before July 19, 2005, and in anticipation of a PDS becoming its claims administrator, the plaintiff provided its entire existing customer base to PDS to be loaded on PDS's computer system. By email, Kevin Mohan of PDS told Terry about the plaintiff providing the customer base and commented,

> I don't know why they would do so unless they were thinking about flipping some of their existing business. We can't afford to have that happen given their profitability for the WTEC Group [Warrantech] and given the reinsured nature of PDS's business. . . . Also, we shouldn't be unduly incenting [*sic*] them to move existing business because PDS's admin fees are overly attractive relative to WTEC's fees."

At a meeting arranged to discuss proceeding with PDS, the plaintiff learned that all the computer information sent to PDS had been deleted and would have to be reproduced before PDS could take over as claims administrator.

In September 2005 Crumley asked Joel San Antonio of Warrantech about a direct relationship with Great American in the event that something happened to Warrantech. San Antonio refused and stated that Warrantech was not interested in permitting more of a direct relationship than already existed.

5

In November 2005, in a filing with the Securities and Exchange Commission, Warrantech stated that the arrangement between Warrantech and Great American had been modified by mutual agreement. After receiving this news, Bob Shepard with PDS emailed others at PDS warning them that Terry at Great American needs to know "that the 'we don't eat off the company plate' reasoning we are using now to turn down business [with the plaintiff] will not work much longer. So we need approval to turn it down for protective legal reasons or some other reason that will pass muster."

In the meantime, the plaintiff told Dan Schmidt at PDS that they were ready to begin sending approximately 1200 pieces of business to PDS as soon as December 2005.[2] Schmidt informed Shepard of the plaintiff's intent. The next email was from Schmidt to Glime, CEO of the plaintiff, on November 15, 2005. The email states:

> Ron and Ben,
>
> I will cut and paste the answer I received today regarding forwarding your business to PDS.
>
> No roll over of WTEC business will be allowed per GAIC without WTEC knowledge as evidenced by some kind of email, fax or letter from Joel San Antonio to VPP with a CC to Ken Schneider of GAIC/PLLS. VPP's willingness, approval or their statement that it is OK with WTEC is not sufficient.

---

[2] The email actually says "December 2004" but this was clearly an error since the email was sent in November 2005.

So I would say at this point that the next step will be the communication from Mr. San Antonio.

Thanks, Dan.

The plaintiff then arranged a conference call with representatives from PDS and GAIC. During the call, GAIC affirmed that it was prohibiting PDS from administering vehicle services contracts for the plaintiff, including the plaintiff's customers who had never had vehicle services contracts administered by Warrantech and customers who refused to do business with Warrantech. Glime and Crumley were told by Terry and Schneider that Great American was worried that Warrantech was going to sue them.

Great American then demanded an increase in the fees PDS would charge the plaintiff for administering the claims. The plaintiff refused. A series of in-house emails at PDS ended with the following from Kevin Mohan:

> As you suggested, please verify the contract's cancellation provision and our ability to refuse to accept business. When I briefly reviewed the contract several months ago, I remember that the contract was not very forceful (silent?) about our ability to reject business.

The plaintiff asked Warrantech if it would agree to allow PDS to administer its vehicle service contracts. Warrantech refused. The plaintiff asked Great American to continue insuring its contracts for several more months so the plaintiff could find another insurer. Great American refused unless Warrantech agreed in writing and the plaintiff agreed to new terms. Specifically, Great

7

American would continue to insure the plaintiff's vehicle service contracts for four more months, but PDS would only be allowed to administer service vehicle contracts for those customers who refused to do business with Warrantech, for each of which the plaintiff would pay Warrantech $10 in addition to the fees to PDS for the contracts. The plaintiff believed that it had no recourse but to sign the new Memorandum of Understanding prepared by Great American so that it could stay in business long enough to find another insurer.

The plaintiff claims seven causes of action under statutory and common law, and seeks damages for its loss of income, expenses, and other damages. The claims are: (1) breach of contract against PDS; (2) inducement to breach contract; (3) intentional interference with business relationships; (4) economic duress; (5) deceit (misrepresentation); (6) Tennessee Consumer Protection Act (Tenn. Code Ann. §§ 47-18-101, *et seq.*); and (7) civil conspiracy.[3]

## II. LEGAL DISCUSSION

A. <u>Standard of Review</u>

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted, "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

---

[3] By previous order of this court [docs. 30 and 31], the plaintiff's cause of action for civil conspiracy was dismissed.

as to any material fact and that the movant is entitled to judgment as a matter of law."  As the Supreme Court stated in *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986), this "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which  that party will bear the burden of proof at trial."  Thus, the moving party's burden may be discharged by showing that there is an absence of evidence to support the non-moving party's case.  *Id.* at 325.  In order for a non-moving party to defeat a motion for summary judgment, the non-moving party must come forward with persuasive evidence to support his or her claim or demonstrate that there is a genuine material factual dispute; that is, the non-moving party must produce evidence on which the jury could reasonably find for the non-moving party.  *Id.* at 324.

B.  <u>Plaintiff's Motion for Partial Summary Judgment</u>
<u>for Breach of Contract</u>

In its motion for partial summary judgment, the plaintiff contends that PDS breached the Agreement when it attempted to modify the Agreement and require Warrantech's approval before PDS would process any of the plaintiff's claims.  In response, PDS argues that the Agreement was not self-executing because it required PDS to approve certain things before the plaintiff could place any business with PDS.  Further, PDS argues that it processed every claim it

9

actually received, and that the parties mutually agreed to abandon the Agreement when they could not resolve their differences over the fees.

The Agreement provides, and the parties do not dispute, that the law of Illinois is to be applied to the interpretation of the Contract.  In Illinois, the construction of a contract is an issue of law to be decided by the trial court.  *See Intersport, Inc. v. Nat'l Collegiate Athletic Ass'n.*, 885 N.E.2d 532, 538 (Ill. App. 2008).  "The court's primary objective in construing a contract is to ascertain and to give effect to the intent of the parties, so long as it does not conflict with any rule of law or public policy."  *Id.*  The first step is to examine the language of the contract because the plain and ordinary meaning of the terms are the best indicators of the parties' intent.  *Id.*  The second step is to determine if there is any ambiguity in the contract language.  *Id.* at 539.  "Where there is no ambiguity, the court will ascribe to the terms their plain and ordinary meaning."  *Id.*  Further, under Illinois law,

> every contract implies good faith and fair dealing between parties to it.  The covenant of good faith and fair dealing is not an independent source of a cause of action under Illinois law.  Rather, breach of the duty of good faith and fair dealing is simply a breach of the underlying contract.

*Kinesoft Dev.Corp. v. Softbank Holdings, Inc.*, 139 F. Supp. 2d 869, 894 (N.D. Ill. 2001) (citations omitted).

In its motion for partial summary judgment on the issue of PDS's alleged breach of contract, the plaintiff argues that there is nothing in the Agreement between the parties that would allow PDS to refuse to administer any of the claims unless a third party like Warrantech approved. The plaintiff points out that PDS's refusal to accept and process the business was not based on a suggestion that the services were not a subject of the Agreement or that the plaintiff had failed to comply with some provision of the Agreement. Rather, PDS attempted to modify the Agreement in a substantial way by requiring the plaintiff to accept third party approval before PDS would perform. The plaintiff argues that this attempt to modify the Agreement was a breach of the Agreement. The court agrees. There is nothing in the Agreement that would allow PDS to make such a material modification of the Agreement without further consideration, and PDS's refusal to accept "rollover" business on this basis was a breach of the Agreement.

PDS attempts to argue that it had to "consent" to the terms of all new business. In her deposition, Lisle Greenweller of PDS states that PDS "never had an agreement to accept contracts." The court has reviewed the Agreement and can find no language giving PDS the authority to refuse to accept any of the claims sent to it, be it Warrantech business or new business. In fact, section 4.1 of the Agreement states: "VPP appoints PDS to administer all Program Claims" (emphasis added). This is supported by the email from Kevin Mohan where he

11

recognized that the Agreement was "not very forceful (silent?) about our ability to reject business."  Bob Shepard's email also recognizes that PDS did not have a good excuse to refuse the plaintiff's business:  "[T]he 'we don't eat off the company plate' reasoning we are using now to turn down business will not work much longer.  So we need approval to turn it down for protective legal reasons or some other reason which will pass muster."

PDS also argues that there were clauses in the Agreement which provided that PDS had to approve certain items before it would accept business from the plaintiff; thus it could refuse to accept business from the plaintiff until those items had been approved.   A review of the Agreement shows that none of these so-called "approvals" had anything to do with the modification of the Agreement that PDS was attempting to impose on the plaintiff.  First, in the definitions section of the Agreement, section 1.11 defines the term "Program(s)" as "any VPP VSC [vehicle service contract] Program or VPP Limited Warranty Program approved by PDS and insured by GAIC."  This definition covers types of programs the plaintiff might sell, not the source of claims.  Second, PDS reserved the right to approve certain types of marketing materials. [Doc. 45, Admin. Agreement § 2.5].  PDS also argues that there were some financing details that had not been settled by the time the plaintiff wanted to start sending business to PDS.  Whether this would have been a basis to refuse the plaintiff's business is unknown because there is nothing in the record to show that this or any of the

12

other arguments PDS now makes were reasons for refusing to perform per the Agreement.

The court finds that PDS's attempt to materially modify the Agreement between the parties was a breach of the Agreement. The issue of what damages, if any, to which the plaintiff might be entitled remains for trial.


## C. Defendants' Motion to Strike

Before addressing the defendants' motion for summary judgment, the court must first address the defendants' evidentiary objections to and motion to strike portions of the affidavits the plaintiff attached to its response to the defendants' motion for summary judgment. The defendants raise 86 objections to statements in the affidavits of Glime, Crumley, and Lanny Henley. The objections are mainly based on Federal Rules of Evidence 602 and 701, with a few objections based on hearsay and relevance. The court finds that the objections are not well taken and the objections will be overruled in their entirety.[4]

Rule 602 of the Federal Rules of Evidence provides:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of

---

[4] To the extent that the defendants seek to "strike" the statements, the court points out that such a motion is not appropriate. "An affidavit is not a pleading that is subject to a motion to strike under Rule 12(f)," *Scott v. Dress Barn, Inc.*, No. 04-1298-T/AN, 2006 WL 870684 at *1 (W.D. Tenn. Mar. 31, 2006), because neither motions nor responses are "pleadings" within the meaning of Rule 12(f). *Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006).

13

> the witness' own testimony. This rule is subject to the
> provisions of Rule 703 relating to opinion testimony by
> expert witnesses.

Generally, testimony should be permitted "so long as a reasonable person could believe that the witness had personal knowledge. In other words, the testimony is excluded only if, as a matter of law, no juror could reasonably conclude that the witness perceived the facts to which she testifies." 27 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6022 (2d ed. 2007). The threshold for establishing that a witness's testimony meets the requirements of Rule 602 is "low." *U.S. v. Franklin*, 415 F.3d 537, 549 (6th Cir. 2000).

Rule 701 of the Federal Rules of Evidence provides:

> If the witness is not testifying as an expert, the witness'
> testimony in the form of opinions or inferences is limited
> to those opinions or inferences which are (a) rationally
> based on the perception of the witness, (b) helpful to a
> clear understanding of the witness' testimony or the
> determination of a fact in issue, and (c) not based on
> scientific, technical, or other specialized knowledge with
> the scope of Rule 702.

Thus, lay opinion testimony must be based on the personal knowledge of the witness, be helpful to an understanding of the witness's testimony or a fact in issue, and may even go to the "ultimate issue" in the case. *See, e.g.*, *U.S. v. Paris*, 243 F.3d 286, 288 (6th Cir. 2001).

In their motion, the defendants offer no explanation as to any of the objections beyond listing the rule of evidence upon which they rely. Although the

14

court has reviewed each of the 86 objections raised by the defendants, the court declines to address each objection and finds that a few examples will suffice to demonstrate the objections' lack of merit.

| Statement | Source | Objection |
|---|---|---|
| "Those funds were regularly deposited into an account at the Bank of Tennessee on which the signatories were either Warrantech Automotive, Inc., or the Great American Insurance Company, and to that extent the Bank had a business relationship with Great American Insurance Company." | Henley Aff. ¶ 4 | Inadmissible conclusion/ argument (Fed. R. Evid. 602, 701) Inadmissible opinion testimony (Fed. R. Evid. 701) Lacks foundation/ inadmissible speculation (Fed. R. Evid. 602) |

 As to this objection, the defendants do not explain how it is that Lanny Henley, the Vice President of Bank of Tennessee, who states his familiarity with the "longstanding banking relationship with Vehicle Protection Plus," would not have personal knowledge of the banking relationship he describes in this statement. This objection borders on frivolous.

| "Once such a contract is sold there must be paid from the proceeds a premium to the insurer of the contractual liability insurance policy, and a dollar amount as prescribed by that insurer must be reserved and set aside for the payment of claims for authorized repairs to the vehicle which is the subject of that contract." | Glime Aff. ¶ 6 | Inadmissible conclusion/ argument (Fed. R. Evid. 602, 701) Inadmissible opinion testimony (Fed. R. Evid. 701) Lacks foundation/ inadmissible speculation (Fed. R. Evid. 602) |

This statement is a factual statement by one of the owners of Vehicle Protection Plus. The statement is not a conclusion, opinion, argument, or speculation, and

15

Glime, as one of the owners of the business, is qualified to explain what happens to the proceeds of the contracts his company sells.

| "The terms of the aforesaid directive from Great American were communicated to VPP by Bob Shepard on December 23, 2005, when he simply pasted those directives into an e-mail from PDS to VPP . . . ." | Glime Aff. ¶ 65 <br><br> Crumley Aff. ¶ 90 | Inadmissible conclusion/ argument (Fed. R. Evid. 602, 701) <br> Lacks foundation/ inadmissible speculation (Fed. R. Evid. 602 |
| --- | --- | --- |

This is a factual statement by each of the owners of Vehicle Protection Plus about how they received information from PDS about the conditions under which PDS would do business with Vehicle Protection Plus. The email referenced in the statement is attached to each affidavit. Thus, the statement is not an inadmissible conclusion, argument, or speculation.

| "All of the terms agreed to by PDS and VPP for a captive reinsurance arrangement are contained in the example prepared by Bob Shepard and included in his e-mail to Ronald Glime on November 29, 2004 . . . as well as the fees set forth in the Administrative Agreement entered into between VPP and PDS. . . and the insurance reserves established by Great American for every vehicle service contract marketed by VPP, which in 2004 and 2005 in the schedules attached hereto . . . | Crumley Aff. ¶ 49 | Inadmissible conclusion/ argument (Fed. R. Evid. 602, 701) <br> Inadmissible opinion testimony (Fed. R. Evid. 701) <br> Lacks foundation/ inadmissible speculation (Fed. R. Evid. 602) <br> Unfairly prejudicial/ misleading (Fed. R. Evid. 403) |
| --- | --- | --- |

Crumley is one of the owners of Vehicle Protection Plus. He is stating his understanding of the agreement between the parties. The referenced email and schedules are attached to the affidavit. Further, the court cannot imagine how this statement is unfairly prejudicial or misleading.

16

The court believes that these examples are representative of the objections to the affidavits of Glime, Crumley and Henley. The court notes that there are a few hearsay objections which may or may not be well taken, but the court finds that it does not need to address those particular objections. The court is well aware of its responsibility to disregard statements in affidavits that are inadmissible for any reason. *See Lombard v. MCI Telecomms. Corp.*, 13 F. Supp. 2d 621, 625 (N.D. Ohio 1998) ("court should '*disregard*' inadmissible evidence, not strike that evidence from the record") (emphasis in original).

The defendants' objections to and motion to strike portions of the plaintiff's affidavits will be overruled and denied.

## D. Defendants' Motion for Summary Judgment

In their motion for summary judgment, the defendants make only one argument – that the plaintiff's claims for damages are "completely unsubstantiated." In opposition to the defendants' motion, the plaintiff argues that there are genuine issues of material fact making the defendant's motion for summary judgment inappropriate. Hundreds of pages of documents including affidavits with exhibits and deposition testimony have been submitted by both parties in support of their positions. The defendants do not argue that any of the categories of damages sought by the defendants are not available as a matter of law; rather they argue that damages are an essential element of all the plaintiff's

17

claims and the plaintiff cannot prove that it is entitled to any damages on any of the claims.

As described by Douglas Chaffins, who submitted a loss report for the plaintiff, there are four categories of damages sought by the plaintiff: (1) loss of participation in the Insurance Reserve Account ($1,767,402); (2) loss of all investment income from participation in the Insurance Reserve Account ($570,722); (3) expenses incurred in finding alternative insurance and claims administration ($231,591); and (4) loss of an agent due to failure to transition to PDS ($71,680). These amounts are offset by a cost reduction of fee expense with their new insurer, Old Republic ($137,677) [doc. 48, exh. 13].

(*1*) *and* (*2*)  *Loss of Participation in an Insurance Reserve Account and Loss of Investment Income*

The defendants contend that the plaintiff never agreed to or entered into a written reinsurance agreement with PDS so the plaintiff was never entitled to participate in any reserve account. In contrast, the plaintiff, through the deposition testimony and affidavits of its principals, submits that in the fall of 2004 all the terms of a reinsurance agreement had been agreed upon between the parties before the Administrative Agreement was signed. The plaintiff has submitted a series of emails between Glime and Shepard of PDS which discuss the terms of the captive reinsurance program and the plaintiff's participation in the

18

reserves.  The plaintiff argues that the interference of Great American and PDS's breach of contract were the reasons it was never reduced to writing.

The court finds that there are genuine issues of fact concerning whether the defendants, particularly Great American, are liable to the plaintiff for these damages.  By way of an example only,  if the jury should find that Great American interfered with the plaintiff's business relationship with PDS, and that interference prevented the plaintiff and PDS from finalizing their understanding concerning an insurance reserve account, then the jury might find that the plaintiff was entitled to damages due to the alleged interference.  The defendant's motion for summary judgment as to these damages will be denied.

### (3) Expenses Incurred in Finding Alternative Insurance and Claims Administration

The defendants argue that the plaintiff never experienced a lapse in coverage during its transition to Old Republic; that it never received a cancellation from Great American; and that Great American continues to process claims for the plaintiff that it insured.  The defendants also argue that the plaintiff knew as early as 2003 that the Warrantech-Great American relationship was in trouble so the plaintiff had two years to find alternative insurance and claims administration. Finally, the defendants point out that the plaintiff ultimately benefitted from its new arrangement with Old Republic because it was not as expensive as its deal with Great American and Warrantech.

19

In response, the plaintiff points out that it believed that it had taken care of its future needs for claim administration and insurance by entering into the Agreement with PDS. It was only after PDS refused to process the rollover business from Warrantech, allegedly at the insistence of Great American, that the plaintiff found itself in danger of going out of business. The plaintiff claims that the costs of changing its contract forms and making adjustments to its vehicle services contracts so that PDS could administer its claims had to be incurred again after PDS breached the contract. Further, the plaintiff incurred new costs of seeking out a replacement claims administrator and insurer within a few months so that its business would continue.

There is an issue of fact concerning expenses the plaintiff might have incurred in securing new insurance and a new claims administrator after PDS refused to perform. The defendants' motion for summary judgment on these damages will be denied.

### (4) Loss of an Agent

The defendants argue that they were not at fault and not liable for damages for the plaintiff's loss of the business of Auto Dealer Marketing Group ("ADM"). Furthermore, the defendants argue that any damages calculation would be speculative. In support of their arguments, the defendants rely on the affidavit of Harold E. Haldeman, president of ADM, wherein he states that the decision to stop doing business with VPP in spring of 2006 "had nothing to do with Great

20

American Insurance Company or Premiere Dealer Services, Inc." [Doc. 48, exh. 15]. The defendants also contend that Glime's deposition testimony supports their argument. When Glime was asked about the reason ADM gave for leaving VPP, Glime admitted that he never received a reason. As the questioning continued, Glime stated:

> Q But when they [ADM] disappeared you have no reason to believe it had anything to do with PDS or Great American, correct, as opposed to just a market decision based upon products and availability?
>
> A I think it had everything to do with PDS and Great American. If we'd have continued – been able – if they'd honored their contract that they gave us, PDS, insured by Great American, we never would have – we never would have lost ADM. They'd still be writing business with us today.

The plaintiff argues that ADM would have lost significant income if it had stayed with the plaintiff after Old Republic became its new insurer, and this had to be the reason ADM discontinued doing business with the plaintiff.

The court finds that the plaintiff's belief that ADM left because of financial reasons is nothing more than speculation. Glime admits that he was never given a reason by ADM for leaving the plaintiff, and in the face of Haldeman's affirmative statement that ADM's decision had nothing to do with the defendants, any blame for losing the client is speculative at best.

The court finds that the defendant is entitled to summary judgment on this measure of damages. This finding, however, does not result in a

21

dismissal of any of the plaintiff's claims since there is no particular count connected to the loss of ADM as a business client.

### III. CONCLUSION

For the reasons discussed above, the plaintiff's motion for partial summary judgment against PDS for breach of contract will be granted; the defendants' evidentiary objections and motion to strike will be denied; and the defendants' motion for summary judgment will be denied in part and granted in part (as to damages for loss of ADM as an agent).  An order reflecting this opinion will be entered.

ENTER:


_____*s/ Leon Jordan*_____
United States District Judge